# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46768-2-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| DEMAR MICHAEL NELSON, | |
| Appellant. | |

MAXA, J. – Demar Nelson appeals his conviction and sentence for first degree murder of James Guillory. We hold that (1) the State presented sufficient evidence of premeditation, (2) the prosecutor did not make impermissible comments on Nelson's post-incident silence during cross-examination and closing argument, and (3) the trial court erred by failing to inquire into Nelson's ability to pay before it imposed discretionary legal financial obligations (LFOs). Accordingly, we affirm Nelson's conviction of first degree murder but remand for reconsideration of discretionary LFOs.

## FACTS

On the night of December 26, 2008, Nelson went to a bar in Lakewood with Grady Brown and Calvin Davis. Nelson encountered his friend Joseph Coleman at the bar. Guillory went to the same bar that night with Ryan Blosser, Robert Poeltl, and Jamar Robinson.

After both groups left the bar, Blosser and Coleman ended up in a fistfight in the parking lot. Police broke up the fight, but the men agreed to finish the fight at a mutual friend's house.

Coleman asked Nelson, Brown and Davis to come to the fight to make sure that Blosser's friends would not attack him. They agreed and arrived at the house shortly after Coleman. Blosser, Guillory, Poeltl and Robinson were already there on the front porch. Blosser and Coleman resumed their fight in the street, and Nelson, Brown and Davis stood outside of Brown's car.

Guillory left the porch and approached Nelson. Guillory was drunk and made comments to Nelson that implied he wanted to fight. Nelson told Guillory to calm down and that he did not want to fight. Guillory was pacing and took his shirt off. He then moved quickly toward Nelson. Nelson told Guillory to back up and drew a pistol.

According to Nelson, Guillory continued to move toward him. When Guillory was about four feet away, Nelson fired a couple of shots that intentionally missed him. Guillory continued to move forward and Nelson then aimed at him and fired repeatedly until his gun had emptied the remaining rounds in his ammunition clip. Nelson claimed that Guillory was still standing when Nelson got into Brown's car and left the scene.

Poeltl provided a different version of the shooting. He stated that Guillory took a step or two toward Nelson and then Poeltl heard shots. There was a pause and then Nelson approached Guillory and shot him several times. The pause was long enough for Nelson to get closer to Guillory. Poeltl testified that Guillory turned around and was trying to run as he was getting shot. Finally, Poeltl stated that after Guillory had been shot, Nelson stood over him and shot him a few more times as Guillory was wiggling on the ground.

Nelson left with Brown and Davis. In the car, Nelson asked Brown and Davis if they were okay. He also said that he told Guillory to back up a couple of times. Nelson did not say

anything else to Brown and Davis about the shooting. He did not say that he shot Guillory in self-defense. Nelson also did not call the police.

Police recovered 18 bullet casings from the area around Guillory's body. An autopsy indicated that 15 of the bullets that Nelson fired struck Guillory, with at least five of the shots causing fatal wounds to the chest area. At least four shots entered through Guillory's back.

Almost two years later, the State charged Nelson with first degree murder. The trial started in September 2014, close to six years after the shooting. At trial, Nelson stipulated to killing Guillory. Nelson argued that he acted in self-defense, and he testified at trial.

The trial court ruled that the State could impeach Nelson with his failure to characterize the shooting as self-defense immediately after the shooting. During cross-examination, the prosecutor asked Nelson two questions about the fact that he did not call the police or tell the others in the car that he acted in self-defense. The prosecutor also elicited from Brown and Davis that Nelson did not say anything in the car about acting in self-defense.

During closing argument, the prosecutor made two references to Nelson's conduct after the shooting and a reference to the fact that Nelson had not told the people in the car that he shot Guillory in self-defense. Nelson did not object to these comments.

The jury found Nelson guilty of first degree murder and also returned a special verdict supporting a firearm sentencing enhancement. The trial court sentenced Nelson to 481 months. The trial court also imposed $3,300 in LFOs, including $2,500 in discretionary LFOs for court-appointed attorney fees and costs. The trial court did not inquire into Nelson's ability to pay LFOs.

Nelson appeals his conviction and sentence.

ANALYSIS

A.    SUFFICIENCY OF PREMEDITATION EVIDENCE

Nelson argues that the State presented insufficient evidence of premeditation, which is an element of first degree murder.  We disagree.

1.    Standard of Review

When evaluating the sufficiency of evidence for a conviction, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt.  *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014).  We assume the truth of the State's evidence and all reasonable inferences drawn from that evidence when evaluating whether sufficient evidence exists.  *Id.* at 106.  We also defer to the trier of fact's resolution of conflicting testimony and evaluation of the persuasiveness of the evidence.  *Id.*

2.    Legal Principles

To convict a defendant of first degree murder, the State must prove that the defendant acted with "premeditated intent to cause the death of another person."  RCW 9A.32.030(1)(a).  Premeditation is "the deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short."  *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991).  The State may prove premeditation through circumstantial evidence if the inferences drawn from the evidence are reasonable and the evidence is substantial.  *Id.* at 83.

But proof of premeditation requires more than the fact that the defendant had an opportunity to deliberate.  *State v. Bingham*, 105 Wn.2d 820, 827, 719 P.2d 109 (1986).

"Otherwise, any form of killing which took more than a moment could result in a finding of premeditation, without some additional evidence showing reflection." *Id.* at 826. And RCW 9A.32.020(1) states that "the premeditation required in order to support a conviction of the crime of murder in the first degree must involve more than a moment in point of time."

Washington courts have recognized that a number of factors may provide evidence of premeditation, including:

(1) The infliction of multiple wounds or multiple shots. *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006) ("[t]his court has found that sufficient evidence supported the jury's finding of premeditation in cases where multiple wounds were inflicted with a knife or other weapon"), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 768-69, 336 P.3d 1134 (2014); *State v. Cross*, 156 Wn.2d 580, 627, 132 P.3d 80 (2006) ("Multiple blows are strong evidence of premeditation."); *Hoffman*, 116 Wn.2d at 84 (noting that the firing of "a considerable number of shots" supported a finding of premeditation); *State v. Ra*, 144 Wn. App. 688, 703, 175 P.3d 609 (2008) ("Examples of circumstances supporting a finding of premeditation include . . . multiple wounds inflicted or multiple shots.").

(2) A time interval or pause between shots. *Ra*, 144 Wn. App. at 704 (finding that a pause between shots supported an inference that the defendant had time to deliberate on and weigh his decision to kill the victim); *State v. Sargent*, 40 Wn. App. 340, 353, 698 P.2d 598 (1985) (finding that evidence that the victim received two blows to the head with some interval between them provided sufficient evidence of premeditation).

(3) Continued firing after missing with the first shots. *Ra* 144 Wn. App. at 704 (finding that continued firing after missing twice supports a finding of premeditation).

(4) Attacking the victim from behind. *State v. Allen*, 159 Wn.2d 1, 8, 147 P.3d 581 (2006) ("Sufficient evidence of premeditation may also be found . . . where the victim was struck from behind."); *Hoffman*, 116 Wn.2d at 84 ("An attack on a victim from behind may indicate premeditation."); *State v. Ollens*, 107 Wn.2d 848, 853, 733 P.2d 984 (1987) (noting that the defendant striking the victim from behind was a "further indication of premeditation").

3.    Premeditation Analysis

The factors listed above support a finding of sufficient premeditation evidence. First, the evidence showed that Nelson shot Guillory 15 times. This evidence supports an inference that Nelson's repetitive firing was premeditated.

Second, there was evidence that Nelson fired his shots in two phases. Nelson testified that he first fired a couple of shots not aimed at Guillory. He then paused before firing the remaining shots, which emptied the ammunition clip. Poeltl testified that Nelson paused long enough to move closer to Guillory before firing additional shots. The pause in Nelson's shots after he missed Guillory shows that he had an opportunity to deliberate. And his moving toward Guillory supports an inference that he decided to kill Guillory after that deliberation.

Third, the evidence shows that Nelson continued firing after intentionally missing with the first few shots. During the second phase of shooting Nelson was aiming at Guillory directly. Continuing to fire and the change in aim supports an inference that Nelson made a conscious decision to kill Guillory. Also, Poeltl testified that after Guillory had been shot and was lying on the ground, Nelson stood over him and shot him again. Standing over a person who had been shot multiple times and shooting him again supports a finding of premeditation.

Fourth, Poeltl testified that Guillory had turned around and was trying to run away when Nelson shot him. And the evidence indicated that at least four of Nelson's shots entered through Guillory's back. This evidence allowed the jury to find that Nelson deliberated and decided to continue to fire lethal shots at Guillory even as Guillory retreated.

Taken together and viewing the evidence in the light most favorable to the State, these factors constitute sufficient evidence of premeditation. Accordingly, we hold that the State presented sufficient evidence to support the first degree murder conviction.

B. PROSECUTORIAL MISCONDUCT – COMMENT ON PREARREST SILENCE

Nelson argues that the prosecutor committed misconduct by making comments regarding Nelson's failure to say after the shooting that he acted in self-defense, which improperly encouraged the jury to infer guilt from silence. We disagree.

1. Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). Misconduct is prejudicial if there is a substantial likelihood it affected the verdict. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

2. Comment on Silence

The Fifth Amendment to the United States Constitution states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Washington Constitution states that "[n]o person shall be compelled in any criminal case to give evidence against himself." Both provisions guarantee a defendant the right to be free from self-

7

incrimination, including the right to silence. *State v. Pinson*, 183 Wn. App. 411, 417, 333 P.3d 528 (2014). This right precludes the State from using the defendant's silence to its advantage either as substantive evidence of guilt or to invite an inference that the defendant's silence is an admission of guilt. *State v. Burke,* 163 Wn.2d 204, 217, 181 P.3d 1 (2008).

However, the State is allowed to present evidence of the defendant's silence if (1) the defendant testifies at trial, (2) the evidence is limited to the defendant's silence before arrest and before issuance of *Miranda*[1] warnings, and (3) the evidence is limited to impeachment of the defendant's trial testimony and not used to show guilt. *Id.* at 217-18. The fact that the defendant testifies does not automatically transform a comment on prearrest silence into impeachment. *Id.* at 215-16. Impeachment is evidence offered solely to show that the witness is not being truthful. *Id.* at 219.

When a prosecutor makes a statement about the defendant's silence, we must consider whether the prosecutor manifestly intended the remark to be a comment on the right to silence or whether the remark was a "mere reference" to silence. *Id.* at 216. A comment on silence violates the defendant's constitutional right to silence and occurs when the State "invites the jury to infer guilt from the invocation of the right of silence." *Id.* at 217. But a prosecutor's mere reference to the defendant's silence is not necessarily a constitutional violation. A statement is a mere reference if it is so subtle and brief that it does not naturally and necessarily emphasize the defendant's silence. *Id.* at 216. A mere reference to silence is not reversible error absent a showing of prejudice. *Id.*

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3. Cross-Examination Questions

Nelson argues that the prosecutor violated his right to silence by asking him about his failure to tell his friends or report to police that he acted in self-defense. We disagree because this questioning involved proper impeachment evidence.

At trial, the State had the burden of disproving Nelson's self-defense claim. Nelson testified that all he said to his friends after the shooting was "I was telling the guy to back up a couple of times" and that he did not call the police after leaving the scene. Report of Proceedings (RP) at 1142. During cross-examination the prosecutor questioned Nelson:

> Q. You did absolutely nothing in regard to calling the police, telling these guys in the car that you shot in self-defense, none of that?
>
> A. Correct.
>
> Q. This is when you are saying that.
>
> A. Correct.

RP at 1159.

This questioning involves classic impeachment. Nelson testified at trial – almost six years after the shooting – that he shot Guillory in self-defense. But he did not tell anybody at the time that he acted in self-defense. The State elicited this testimony to support an argument that Nelson had recently fabricated this defense and that his trial testimony was false. The State was implying that Nelson's claim of self-defense was less credible because he had not mentioned it to anyone until after he was charged with Guillory's murder. "Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Jenkins v. Anderson,* 447 U.S. 231, 239, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980).

9

We hold that the prosecutor's questions during cross-examination regarding Nelson's prearrest silence were proper because they were used for impeachment and not to imply guilt.

4.    Statements About Nelson's Conduct

Nelson argues that two statements the prosecutor made during closing argument about his conduct after the shooting impermissibly commented on silence.

> *Look at what he did afterward*.  Rationalize this case, use your common sense in deciding this case, and you will discover of course that he raised self-defense because that's all he could do.

RP at 1190 (emphasis added).

> The defendant is guilty of Murder in the First Degree based on the number of shots, based on the location of the shots, *based on the defendant's demeanor* both before and *after this killing*.  The State is asking you to find the defendant guilty.

RP at 1193 (emphasis added).

Nelson argues that discussing in the first statement what Nelson did after the shooting and in the second statement his demeanor after the shooting are comments on his silence. However, the statements do not expressly mention Nelson's silence and do not seem to even indirectly refer to silence.  The statements could encompass a number of actions other than Nelson failing to tell his friends that he shot in self-defense or failing to call the police.  Even if these statements did relate to Nelson's silence, they were so indirect, subtle and brief that they would be considered "mere references" to silence.  *Burke,* 163 Wn.2d at 216.  Therefore, we hold that the prosecutor did not engage in misconduct by making brief references to Nelson's actions and demeanor after the shooting.

5.    Argument About Nelson's Silence

The prosecutor began his closing argument discussion of Nelson's self-defense claim by talking about the credibility of Nelson's self-defense claim: "Anyone can claim self-defense after the fact. . . . Just because a defendant raises a claim of self-defense doesn't mean it is valid. . . . You are the ones who decide, one, is that true? It is not. It's just not. It can't be." RP at 1189-90. A moment later, the prosecutor made a statement that expressly referenced Nelson's silence:

> Any person – I don't care who you are, any person – if you act in self-defense, whether you are scared or not, you are worried, you are talking, you are especially talking to the two guys in the car. None of them. It is cold-blooded murder.

RP at 1190-91.

As stated above, the State can use a defendant's silence to argue that his or her testimony is not truthful, but not to argue that the defendant is guilty. *Burke,* 163 Wn.2d at 217. Considered in context, the first two sentences of the quoted statement can reasonably be interpreted as referring to Nelson's credibility. These sentences reflect an argument that because Nelson failed to mention self-defense in the car, his trial testimony that he acted in self-defense should be disregarded as untrue. Therefore, those statements standing alone are not improper.

However, the phrase "It is cold-blooded murder" might not refer to credibility. By adding that phrase, the prosecutor potentially transformed the focus of his argument from the credibility of Nelson's self-defense claim to Nelson's guilt of first degree murder. On the other hand, the prosecutor did not specifically argue that Nelson's silence was evidence of his guilt. Therefore, we must determine whether discussion of Nelson's failure to mention self-defense coupled with the "cold-blooded murder" phrase was a comment on Nelson's silence that violated

11

Nelson's constitutional right to silence or a mere reference to silence that constitutes reversible error only if Nelson can show prejudice. *Id.* at 216.

The question in distinguishing between a comment and a mere reference is whether the prosecutor " 'manifestly intended' " his remarks to be a comment on the right to silence. *Id.* (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10 (1991)). Here, the prosecutor began his short argument regarding self-defense by telling the jury that it had to decide Nelson's credibility – whether his claim of self-defense was true. He concluded by arguing that a person acting in self-defense would have said something about self-defense immediately after the shooting, which as discussed above could be interpreted as a credibility argument.

In this context, the prosecutor's comment about cold-blooded murder – which was somewhat disconnected from the previous argument – is ambiguous. The prosecutor may have been attempting to subtly argue that Nelson's silence was evidence of his guilt. But the prosecutor also may have been attempting to argue, rather inartfully, that because Nelson's self-defense claim was not credible the jury should find him guilty of murder. Because of this ambiguity, we cannot find on this record that the prosecutor "manifestly intended" to comment on Nelson's right to silence. Therefore, we hold that the prosecutor's statement was a mere reference and not a comment on Nelson's silence.

Because the prosecutor's statement was a mere reference to silence, it does not constitute reversible error unless Nelson can show prejudice. *Burke,* 163 Wn.2d at 216. Nelson argues that this statement necessarily was not harmless because his credibility was at issue and the prosecutor told the jury that his silence was evidence of guilt. However, as stated above, the prosecutor's statement was ambiguous and the prosecutor never expressly invited the jury to

infer guilt from Nelson's silence. Further, Nelson's silence was relevant to the credibility of his self-defense claim, and the prosecutor properly argued that Nelson's silence affected his credibility. Finally, the jury heard testimony from Nelson himself as well as Brown and Davis that Nelson did not say anything about self-defense immediately after the shooting. The prosecutor's ambiguous reference to that fact would not likely have affected the jury.

We hold that the prosecutor's statement about cold-blooded murder after mentioning Nelson's silence was a mere reference to silence and did not prejudice Nelson. Therefore, we hold that the prosecutor's statement did not constitute misconduct.

C.      IMPOSITION OF LFOS

Nelson argues for the first time on appeal that the trial court erred by imposing discretionary LFOs without making an inquiry into his ability to pay. We exercise our discretion to consider this issue and agree.

1.      Failure to Object at Trial

We generally do not consider issues raised for the first time on appeal. However, the Supreme Court repeatedly has exercised its discretion under RAP 2.5(a) to consider unpreserved arguments that the trial court erred in imposing discretionary LFOs without considering the defendant's ability to pay. *E.g.*, *State v. Duncan*, 185 Wn.2d 430,437, 374 P.3d 83 (2016); *State v. Marks*, 185 Wn.2d 143, 145-46, 368 P.3d 485 (2016); *State v. Leonard*, 184 Wn.2d 505, 506-08, 358 P.3d 1167 (2015); *State v. Blazina*, 182 Wn.2d 827, 830, 344 P.3d 680 (2015).

Here, nothing in the record indicates a possible strategic reason for Nelson's failure to object. And there does not appear to be any compelling reason to decline to consider Nelson's LFO argument. Therefore, we exercise our discretion and consider the issue.

No. 46768-2-II

2.    Failure to Inquire Into Ability to Pay

Before imposing discretionary LFOs, the trial court must make an individualized inquiry into the defendant's present and future ability to pay.  RCW 10.01.160(3); *Blazina*, 182 Wn.2d at 838.  The record indicates that the trial court failed to make any inquiry into Nelson's ability to pay LFOs.  Further, the length of Nelson's sentence indicates a likelihood that he will not have a future ability to pay.  Accordingly, we remand the issue to the trial court in order to allow for an individualized inquiry into Nelson's ability to pay before imposing discretionary LFOs.

CONCLUSION

We affirm Nelson's conviction of first degree murder, but remand for reconsideration of discretionary LFOs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
WORSWICK, J.

_____
BJORGEN, C.J.

14